# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

PIERCE MANUFACTURING INC.,

                Plaintiff,

vs.

REV GROUP, INC. AND E-ONE, INC.,

                Defendants.

Case No. __18-cv-284_____

JURY TRIAL DEMANDED

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

Sherry D. Coley
State Bar No.: 1038243
T. Wickham Schmidt
State Bar No.: 1062002
DAVIS & KUELTHAU, s.c.
318 S. Washington Street, Suite 300
Green Bay, WI 54301
Phone: 920-435-9378
Fax:    920-435-9391
scoley@dkattorneys.com
wschmidt@dkattorneys.com

Todd B. Benoff (admission pending)
Todd.Benoff@alston.com
ALSTON & BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, CA 90071-3004
Phone: 213-576-1000
Fax: 213-576-1100

Scott J. Pivnick
Scott.Pivnick@alston.com
ALSTON & BIRD LLP
The Atlantic Building
950 F Street NW
Washington, DC 20004-1404
Phone: 202-239-3300
Fax:    202-239-3333

Joshua M. Weeks (admission pending)
Joshua.Weeks@alston.com
Lindsay C. Church (admission pending)
Lindsay.Church@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street, Suite 4200
Atlanta, Georgia 30309-3424
Phone: 404-881-7000

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT .................................................................................. 1

RELEVANT FACTS ............................................................................................ 2

ARGUMENT ....................................................................................................... 7

   I.   PIERCE MEETS THE LEGAL STANDARD FOR A PRELIMINARY
       INJUNCTION. ............................................................................................7

   II.   THE COURT SHOULD ENJOIN DEFENDANTS, PENDING A
       DECISION ON THE MERITS. ....................................................................8

      A.  Pierce is Likely to Succeed on the Merits of Its Patent Infringement
          Claims. ..................................................................................................8

          1.  Defendants Infringe the Asserted Patents. ................................8

          2.  The Asserted Patents Are Valid. ............................................16

      B.  Pierce Will Be Irreparably Harmed by the Defendants' Infringing
          Acts. ....................................................................................................16

          1.  There is a Nexus Between Infringement and the Irreparable Harm. ......17

          2.  Pierce's Single Axle Ascendant Quint Directly Competes with
              Defendants' Metro 100 Quint. ...............................................19

          3.  Defendants' Infringing Sales Harm Pierce's Dealers, Which In Turn
              Harms Pierce. .........................................................................20

          4.  Defendants' Infringing Sales Will Have Far-Reaching, Long-Term,
              Negative Impacts on Pierce's Revenues and Profits for the
              Ascendant Single Axle Quint Due to the Nature of the Fire
              Apparatus Industry. .................................................................21

          5.  Defendants' Infringing Sales Will Also Negatively Affect Pierce's
              and Its Dealers' Ability to Sell Other Styles of Trucks, Parts, and
              Service. ..................................................................................22

          6.  Defendants' Infringement Has Eroded Pierce's Pricing ........................23

          7.  Defendants' Continued Infringement of the Metro 100 Quint
              Adversely Impacts Pierce's Brand, Innovation, and Ability to Market
              Itself as the Exclusive Provider of the Patented Technology. ...............24

      C.  The Balance of Hardships Favors Entry of a Preliminary Injunction. ..........24

D.  The Public Interest Favors Entry of a Preliminary Injunction. ..................... 25

CONCLUSION ................................................................................................................. 25

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
544 F.3d 1341 (Fed. Cir. 2008)...............................................................................23

*Apple, Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012)...............................................................................17

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012).................................................................16, 22, 23

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013)...............................................................................18

*Hybritech, Inc. v. Abbott Labs.*,
849 F.2d 1446 (Fed. Cir. 1988)...............................................................................7

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)...................................................................................9

*Oakley, Inc. v. Sunglass Hut Int'l*,
316 F.3d 1331 (Fed. Cir. 2003)...............................................................................16

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012)...............................................................................19

*Reebok, Int'l v. J. Baker, Inc.*,
32 F.3d 1552 (Fed. Cir. 1994).............................................................................7, 8

*Revision Military, Inc. v. Balboa Mfg. Co.*,
700 F.3d 524 (Fed. Cir. 2012).................................................................................8

*Rexnord, Inc. v. Laitram Corp.*,
628 F. Supp. 467 (E.D. Wis. 1986)..........................................................................8

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011)...............................................................................22

*Sanofi–Synthelabo v. Apotex, Inc.*,
470 F.3d 1368 (Fed. Cir. 2006)...............................................................................22

*Sunbeam Prods., Inc. v. Homedics, Inc.*,
670 F. Supp. 2d 873 (W.D. Wis. 2009) ...................................................................8

**Statutes**

35 U.S.C. § 282....................................................................................................................15

**Other Authorities**

U.S. Patent No. 9,597,536......................................................................................................1

U.S. Patent No. 9,814,915......................................................................................................1

## SUMMARY OF ARGUMENT

Plaintiff Pierce Manufacturing Inc. ("Pierce") is a leading manufacturer and marketer of fire and rescue apparatus, including fire trucks. Fire trucks come in numerous configurations, including pumpers which have water tanks and pumps to supply water to firefighters and ladder trucks which have long ladders to allow firefighters to reach the fire. Some manufacturers also offer a specialized truck configuration called a "quint" which combines five of the most useful features of a pumper and a ladder truck. Quints include a pump, a water tank, fire hoses, ground ladders and an aerial device such as an extendable ladder or platform.

In 2015, Pierce introduced the Ascendant Single Axle Quint—the first ever quint configuration fire apparatus to contain a ladder reaching greater than 95 feet vertically and 90 feet horizontally, with a rated tip load capable of holding three people (i.e., 750 pounds), all on a single axle. These features surprised the industry, and Pierce gained widespread praise for its innovation. This innovation also led to significant sales for the Ascendant line of single axle quints.

To protect its significant research and development related to this invention, Pierce sought patent protection. The United States Patent Office issued U.S. Patent No. 9,597,536 ("the 536 Patent") on March 21, 2017, and U.S. Patent No. 9,814,915 ("the 915 Patent") on November 14, 2017 (collectively, "the Asserted Patents").

Defendant E-ONE, Inc. ("E-ONE") operates as a "business unit" of REV Group, Inc. ("REV Group") that manufacturers and sells fire apparatus (Ex. 38 (REV Group 10-K) at F-35). REV Group and E-ONE (collectively, "Defendants") are direct competitors of Pierce in the fire apparatus market. Recognizing the value of Pierce's idea, and wanting to continue to compete with Pierce, Defendants took Pierce's invention and

started making and selling a competitive product, the Metro 100 Quint, that infringes the 536 and 915 Patents.

A preliminary injunction is necessary to stop Defendants from selling infringing products in competition with Pierce, and irreparably harming Pierce by stealing undeserved market share and customers. Further, Defendants' infringing actions have damaged Pierce's dealer network, and will have far-reaching, long-term, negative impacts on Pierce's revenues and profits. Defendants' actions will also cause permanent pricing damage to Pierce, while also disturbing Pierce's ability to sell other styles of trucks, parts, and services. The continued sale of Defendants' infringing products tarnishes Pierce's brand, innovation, reputation as an industry visionary, and ability to market itself as the exclusive provider of the very technology it invented.

Accordingly, Pierce is entitled to a preliminary injunction precluding Defendants from making and selling their infringing fire apparatus pending the final resolution of this case.

## RELEVANT FACTS

**Pierce's Contributions to the Fire and Emergency Vehicle Industry**. Since 1913, Pierce has grown from building fire truck bodies on Model T Ford chassis in an old converted church to the industry's leader in highly customized, innovative, and well designed and engineered fire and rescue vehicles, including quint configuration fire apparatus. To date, Pierce has manufactured more than 30,000 custom chassis apparatus. Pierce's fleet includes the Ascendant Quint, which was the first ever quint fire apparatus with a single axle to have a ladder reaching greater than 95 feet vertically and 90 feet horizontally, with a tip load capable of holding 750 pounds (Declaration of Lisa Barwick ("Barwick Decl.") at ¶ 17).

**The Patented Technology**.  A quint fire apparatus traditionally includes five features: a pump, water tank, fire hose, aerial device, and ground ladders (*id*. at ¶ 10).  Because fire departments can operate quints with less manpower—usually a four-person crew—and the trucks contain all the features needed to respond to fire and emergencies, i.e., a combined aerial apparatus and a pumper, these models are popular among departments smaller in size or with budget constraints (*id*. at ¶ 11).

The combined capabilities of a quint, however, added a great deal of weight to the vehicles.  The additional weight is particularly problematic with apparatus that include high capacity water tanks or long reach aerial devices (e.g., ladders with a reach over 95 feet vertically), which are highly valued to departments in urban areas with tall buildings, as well as suburban areas, where homes may be set back from the roadway 50 or more feet. To support the excess weight, the trucks had to have two rear axles (*id*. at ¶ 12).  But having a second rear axle introduces a host of undesirable consequences: the trucks are harder to maneuver, as they are heavier and longer, are more expensive, and also require more maintenance and upkeep costs since there are more parts subject to mechanical failure and the higher weight causes more wear and tear to the suspension, braking systems, and tires, among other things (*see id*. at ¶ 15).  It was believed, however, that these drawbacks were a necessary price to pay for the quint's capabilities since no one had been able to figure out a way to reduce the weight of the truck to work on a single axle while still maintaining all of the desired functionality.  Until Pierce did.

**Pierce's Development of the Ascendant Quint**.  Pierce, recognizing a long felt need in the marketplace, set out to develop a truck that had all the capabilities of a traditional quint, including a long extensible ladder, but could be deployed on a single

axle (*id*. at ¶ 16).  The result was Pierce's Ascendant line, which includes single axle

trucks containing ladders reaching greater than 95 feet vertically and 90 feet horizontally,

with a rated tip load capable of carrying 750 pounds even when the ladder is fully

extended (*id*. at ¶ 17).  The Ascendant Single Axle Quints retain or exceed all the

traditional benefits of quints, yet are more maneuverable because they weigh less, are

shorter, and have less tail swing since they sit on a single rear axle.  They also cost less

since there is only a single axle, which lowers maintenance costs (*id*. at ¶ 15).

Pierce debuted the Ascendant 107' Single Axle Quint at the 2015 FDIC

International trade show in Indianapolis, Indiana.  The FDIC show is attended by all

major fire truck manufacturers, either directly or through their dealers, as well as

representatives from fire stations all over the country (*id*. at ¶ 22).  Defendants attended

this trade show and saw Pierce's Ascendant 107' Single Axle Quint (*id*.).  Pierce

subsequently showed the Ascendant 107' Single Axle Quint at virtually every major trade

show after this, including:

- FDIC 2015 – Indiana Convention Center & Lucas Oil Stadium, Indianapolis, IN, April 23-25, 2015
- FRI (Fire-Rescue International) 2015 – Georgia World Congress Center, Atlanta, GA, August 28-29, 2015
- FDIC 2016 - Indiana Convention Center & Lucas Oil Stadium, Indianapolis, IN, April 21-23, 2016
- FRI 2016 – Henry B. Gonzalez Convention Center, San Antonio, TX, August 17-20, 2016
- FDIC 2017 - Indiana Convention Center & Lucas Oil Stadium, Indianapolis, IN, April 27-29, 2017
- FRI 2017 – Charlotte Convention Center, Charlotte, NC, July 27-29, 2017

(*id*. at ¶ 22).  On at least one occasion, Jim Salmi, Defendants' Director of Aerial

Platform Development, walked around and inspected the Ascendant 107' Single Axle

Quint (*id*. at ¶ 23).  Photographs of Mr. Salmi inspecting and photographing the

Ascendant Quint Single Axle are provided below:



 (*id*.).

Though other manufacturers were first skeptical of Pierce's ability to create such

a truck, that skepticism transformed to praise following the release of the Ascendant line

(*see id*. at ¶ 19).  One industry publication, *FireRescue*, for example, praised the features

of the Ascendant Single Axle Quint, including the 100 foot horizontal reach, 750 pound

tip load, and 500 gallon water tank, as "something that was said could not be done"

(Carter Decl. at ¶ 77 (citing Ex. 31)).  Another industry publication, *FireFighter Nation*,

similarly praised the design of the Ascendant Single Axle Quint, claiming "Pierce really

went all out on this design" and that, as a result, it "could be the aerial that many fire

departments around the country could opt for" (Carter Decl. at ¶ 75 (citing Ex. 20)).

Since its release, the Pierce Ascendant 107' Single Axle Quint has become the most

popular apparatus in Pierce's more than 100-year history, and has generated significant

profits for Pierce and its dealers (*id*. at ¶ 60).

**Defendants' Infringing Metro 100 Quint**. While industry praise for the Pierce Ascendant Single Axle Quint continued to grow, Defendants announced the Metro 100 Quint. Defendants highlight the same features Pierce developed, which are covered by the Asserted Patents, in marketing the Metro 100 Quint, i.e., the long reach ladder on a single axle. In addition to Pierce, Defendants are the only other manufacturer that offers a single axle quint configuration apparatus with an aerial ladder with a vertical reach greater than 95 feet and a horizontal reach greater than 90 feet. As a result, Defendants' infringing products directly compete with Pierce's Ascendant line of products.

REV and E-ONE introduced the Metro 100 Quint at the 2017 FDIC International trade show, which is a highly-attended industry trade show held each April in Indianapolis, Indiana (Ex. 61). As explained in the Complaint, even after being provided with notice by Pierce that REV and E-ONE infringe Pierce's intellectual property, Defendants not only continued to advertise, market, and sell the Metro 100 Quint, but increased their efforts to do so, routinely posting promotional materials online, and displaying the Metro 100 Quint at numerous trade shows (Dkt. No. 1-1 at ¶¶ 31-38). Even as recent as January 2018, Defendants once again displayed an infringing Metro 100 Quint at the Fire Rescue East trade show in Daytona Beach, Florida (*id.* at ¶ 37). And on February 16, 2018, Defendants again posted materials promoting the Metro 100 Quint on their Facebook page (*id.* at ¶ 38).

Defendants are also registered as an exhibitor for the upcoming 2018 FDIC International trade show, which is being held on April 23-28, 2018 in Indianapolis,

Indiana.[1]  If not enjoined, it is believed that Defendants will continue these infringing

acts, including by selling and offering for sale their infringing Metro 100 Quint at the

2018 FDIC show.

## ARGUMENT

### I.     Pierce Meets the Legal Standard for a Preliminary Injunction.

To obtain a preliminary injunction, the movant must show (1) that it has a

likelihood of success on the merits, (2) that it will suffer irreparable harm if an injunction

does not issue, (3) that the harm it will suffer without an injunction is greater than the

harm the opposing party will suffer if the injunction is granted, and (4) that the public

interest will not be disserved by the issuance of the injunction.  *Reebok, Int'l v. J. Baker,*

*Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994).  "These factors, taken individually, are not

dispositive."  *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988).

Rather, "the district court must weigh and measure each factor against the other factors

and against the form and magnitude of the relief requested."  *Id.*

As described below, Pierce satisfies all of the elements required for obtaining a

preliminary injunction.  *First*, Pierce is likely to succeed on the merits of its claims, and

in particular on Defendants' infringement of the Asserted Patents and the validity of

those Asserted Patents.  *Second*, Pierce will be irreparably harmed by Defendants'

infringement if not estopped by this Court, as no damages payment could address

Pierce's injuries, including harm to Pierce's dealer network, losses stemming from

"ecosystem" and "network" effects, the lost sales of non-patented products, eroded

---

[1] *Available at*
http://events.pennwell.com/FDIC2018/Public/eBooth.aspx?IndexInList=18&FromPage=
Exhibitors.aspx&ParentBoothID=&ListByBooth=true&BoothID=532970.

prices, impaired ability to invest in the types of research and development activities that have made Pierce successful, and damages to Pierce's reputation, among others. *Third*, the balance of harms favors the grant of a preliminary injunction in these circumstances, as Defendants could otherwise continue to unfairly capture market share in the absence of injunctive relief, while having long-lasting effects on Pierce's business and reputation. And *fourth*, the public interest in protecting Pierce's exclusionary rights and encouraging innovation also favors entry of a preliminary injunction.

## II.     The Court Should Enjoin Defendants, Pending a Decision on the Merits.

### A.     Pierce is Likely to Succeed on the Merits of Its Patent Infringement Claims.

In the patent infringement context, a reasonable likelihood of success requires a showing of infringement and validity. *Reebok*, 32 F.3d at 1555. In balancing the four preliminary injunction factors, courts have afforded greater weight to the validity and infringement analysis. *See Rexnord, Inc. v. Laitram Corp.*, 628 F. Supp. 467, 470 (E.D. Wis. 1986) (observing that once the movant shows validity and infringement, "the burden of proving the necessity for injunctive relief, i.e., the no legal remedy and irreparable harm elements, is lesser") (citations omitted).

#### 1.     Defendants Infringe the Asserted Patents.

To show a likelihood of success on the merits, a patent holder must prove that success in establishing infringement is "more likely than not." *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525-26 (Fed. Cir. 2012). Here, as shown below and in the attached expert declaration of Dr. Thomas Kurfess ("Kurfess Decl."), Defendants' Metro 100 Quint infringes claim 20 of each of the Asserted Patents.

The patent infringement analysis consists of two steps: (1) the patent claims must be construed to determine their meaning and scope, and (2) the construed claims are then compared to the Accused Products. *Sunbeam Prods., Inc. v. Homedics, Inc.*, 670 F. Supp. 2d 873, 885 (W.D. Wis. 2009) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)).

*First*, Pierce does not believe there to be any claim construction issues with respect to claim 20 of either Asserted Patent. A person of ordinary skill in the art could readily ascertain the meaning of the terms, and as a result, the terms of claim 20 of each of the patents should be given their plain and ordinary meaning. *See Markman*, 52 F.3d at 986 ("the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean.").

*Second*, Defendants' Metro 100 Quint infringes the 536 and 915 Patents. Claim 20 of the 536 Patent, reproduced below, is representative:

A quint configuration fire apparatus, comprising:

> a chassis;
>
> a body assembly coupled to the chassis and having a storage area configured to receive a ground ladder and a fire hose;
>
> a pump coupled to the chassis;
>
> a water tank coupled to the chassis;
>
> a ladder assembly including a plurality of extensible ladder sections, the ladder assembly having a proximal end that is coupled to the chassis;
>
> a single front axle coupled to a front end of the chassis; and
>
> a single rear axle coupled to a rear end of the chassis,
>
> wherein the single rear axle comprises either: a single solid axle configuration extending laterally across the chassis, or a first axle having a

first constant velocity joint and a second axle having a second constant velocity joint, the first axle and the second axle extending from opposing lateral sides of a differential;

wherein the ladder assembly is extensible to provide a horizontal reach of at least 90 feet and a vertical height of at least 95 feet, wherein the ladder assembly is configured to support a tip load of at least 750 pounds, and wherein the center of gravity of at least one of the chassis, the body assembly, the pump, and the water tank are positioned to counterbalance a moment generated by the tip load with the ladder assembly extended to the horizontal reach of at least 90 feet.

Claim 20 of the 915 patent is nearly identical but removes the requirement that "the ladder assembly be configured to support a tip load of at least 750 pounds" (Kurfess Decl. at ¶ 145). As a result, if the Metro 100 Quint infringes claim 20 of the 536 Patent, it also infringes claim 20 of the 915 Patent.

As shown above, claim 20 relates to a quint configuration fire apparatus, which the Metro 100 Quint indisputably is (*see* Kurfess Decl. at ¶¶ 65-72, 146-149). As pictured below, the Metro 100 Quint has a chassis, with the required features coupled to that chassis: a body assembly with a storage area for ground ladders and fire hose; a pump; a water tank; and a ladder assembly with a plurality of extensible ladder sections (*see also id*. at ¶¶ 73-100, 150-169).



(Ex. 78 (Metro 100 Quint Flyer) (annotated)).

As depicted below, the Metro 100 Quint also has a single front axle coupled to the front end of the chassis, and a single rear axle coupled to the rear end of the chassis (*see also* Kurfess Decl. at ¶¶ 101-105, 170-173). The single rear axle is a single solid axle configuration extending laterally across the chassis, and in particular, Defendants advertise the Dana S35-590 35,000 pound rear axle with Link Atlas air ride suspension (Ex. 77 (Sarasota County Metro 100 Quint Specification); *see also* Kurfess Decl. at ¶¶ 106-110, 174-177).



front axle        rear axle

(Ex. 21 (Metro 100 Quint Webpage) (annotated)).

Claim 20 also recites a ladder assembly that can provide a horizontal reach of at least 90 feet, and a vertical height of at least 95 feet. The Metro 100 Quint is available with at least two different ladders, an HR100 and an HM100, both of which provide the vertical and horizontal reach recited in the claims (Kurfess Decl. at ¶ 118).

For example, the HR100 ladder provides a horizontal reach of 92 feet, and a vertical height of 100 feet (Ex. 60 (E-ONE News Release)). Thus, Metro 100 Quints equipped with the HR100 ladder satisfy these limitations (*see also* Kurfess Decl. at ¶¶ 111-122, 178-185).

The Metro 100 Quint can also be equipped with the HM100 ladder, which provides a horizontal reach of 92 feet and a vertical height of 100 feet, as indicated by the HM100 Ladder Capacity Plate reproduced below.



(*See* Ex. 73 (HM100 Ladder Capacity Plate) (annotated); *see also* Ex. 61 (E-ONE News Release)). Thus, Metro 100 Quints equipped with the HM100 ladder also satisfy these limitations (*see also* Kurfess Decl. at ¶¶ 111-122, 178-185).

Moreover, these ladder assemblies can support a tip load of at least 750 pounds. Defendants advertise that the Metro 100 Quint is designed to meet the standards of the National Fire Protection Association ("NFPA") (*see, e.g.*, Ex. 62 (May 24, 2017 Facebook Post) ("With front tires off the ground, the new Metro 100 Quint clears stability testing with 1.5 times the rated load. All E-ONE trucks exceed SAE and NFPA standards.")). The NFPA standard applicable to aerial fire apparatus is NFPA 1901 which, requires that the aerial device be "capable of sustaining a static load 1 ½ times its rated capacity *in every position in which the aerial device can be placed…*" (Ex. 74 (NFPA 1901) at 19.21.2 (emphasis added); *see also* Kurfess Decl. at ¶¶ 123-133).

Accordingly, an aerial device rated to NFPA standards is actually capable of holding a tip load that is 1 ½ times larger than the ladder's rating (*id.*).

As described above, the Metro 100 Quint can be equipped with an HR100 aerial ladder, which has a *rated* tip load of 500 pounds (*see* Ex. 18 (E-ONE News Release)). Because the ladder assembly is designed to meet or exceed NFPA standards requiring the ability to hold 1 ½ times the rated tip load, the HR100 aerial ladder can actually support a tip load of at least 750 pounds (Kurfess Decl. at ¶¶ 126-128).

Similarly, the HM100 ladder, with which the Metro 100 Quint can also be equipped, also has a rated tip load of 500 pounds, as depicted below:



(*See* Ex. 73 (HM100 Ladder Capacity Plate) (annotated)).

Once again, because the HM100 ladder assembly is designed to meet or exceed NFPA standards, which require the ladder assembly to hold 1 ½ times the rated tip load, the HM100 aerial ladder can support a tip load of at least 750 pounds (Kurfess Decl. at ¶¶ 126, 129-131).

As described above, both the HR100 and HM100 ladders are extensible to a horizontal reach of at least 90 feet. So, to be compliant with the NFPA standards—as Defendants advertise—those aerial devices must support a tip load of 1 ½ times the rated capacity while extended horizontally. In fact, Defendants have advertised this capability on their social media pages, touting that the Metro 100 Quint was "tested and cleared" with the aerial device fully extended "90 degrees off the sides" (Ex. 63 (June 2, 2017 Facebook Post); Ex. 62 (May 24, 2017 Facebook Post)).

To prevent the Metro 100 Quint from tipping over during such tests, the center of gravity of components of the apparatus, such as the chassis, the body assembly, the pump, and the water tank are positioned to counterbalance a moment generated by the tip load with the ladder assembly extended horizontally (Kurfess Decl. at ¶¶ 134-142, 186-189). As explained by Dr. Kurfess, because the torque box, which supports the aerial ladder, and the chassis of the Metro 100 Quint are integrated into a single structure, "the chassis itself, as well as any components mounted to the chassis either directly or indirectly, including the body assembly, the pump, and the water tank, will 'counterbalance a moment generated by the tip load with the ladder assembly extended to the horizontal reach of at least 90 feet'" as recited in claim 20 (*id.* at ¶ 139).

Further, detailed claim charts correlating the limitations of claim 20 of the 536 and 915 Patents with Defendants' fire apparatus are attached as Exhibits 71 and 72,

respectively, to the Declaration of Dr. Thomas Kurfess. As detailed therein, Pierce is likely to succeed on its infringement claim against Defendants.

## 2. The Asserted Patents Are Valid.

The 563 and 915 Patents were properly and legally issued by the United States Patent and Trademark Office, after applications leading to those patents were thoroughly examined and prior art known at the time was considered. As a result, the 563 and 915 Patents are presumed to be valid unless proven otherwise by clear and convincing evidence. 35 U.S.C. § 282.

In addition, it is not the patentee's burden to prove validity at the preliminary injunction stage. *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1339 (Fed. Cir. 2003). Instead, in this context, the patentee must only show that the alleged infringers' invalidity defense lacks substantial merit. *Id.* Accordingly, Pierce reserves the right to respond to Defendants' invalidity defense if one is presented.

## B. Pierce Will Be Irreparably Harmed by the Defendants' Infringing Acts.

The second inquiry, into irreparable harm, seeks to measure harms that no damages payment—however great—could address. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Types of irreparable harm include, for example, price erosion, loss of goodwill, damage to reputation, and loss of business opportunities. *Id.* As even Defendants themselves recognize, there are numerous such harms that result from the violation of one's intellectual property rights:

> To the extent we cannot protect our intellectual property, unauthorized use and misuse of our intellectual property could cause significant damage to our brand name and reputation, interfere with our ability to effectively represent our Company to our customers, contractors, suppliers and/or licensees and increase litigation costs, which could harm our competitive position and have a material adverse effect on our business, financial condition and results of operations.

(Ex. 38 (REV Group Inc. 10-K) at 31).

As shown in the attached Declaration of Andrew Carter ("Carter Decl."), Pierce is being irreparably harmed by Defendants' infringement. This harm includes harm to Pierce's dealer network, losses stemming from "ecosystem" and "network" effects, the lost sales of non-patented products, eroded prices, impaired ability to invest in the types of research and development activities that have made Pierce successful, and damage to Pierce's reputation, among others (Carter Decl. at ¶ 16).

### 1. There is a Nexus Between Infringement and the Irreparable Harm.

There is a direct nexus between the patented features as described in claim 20 of the 536 and 915 Patents and Defendants' sales of the Metro 100 Quint, resulting in irreparable harm to Pierce. *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) (requiring a causal nexus between the infringement and the irreparable harm).

Around three years ago, Pierce recognized a need in the marketplace for a quint configuration fire apparatus having a single rear axle, that offered features previously only found on tandem-axle vehicles, such as a long ladder with a reach of over 95 feet vertically and 90 feet horizontally, a water tank with significant capacity, and the ability to support a significant tip load (e.g., 750 pounds) (Barwick Decl. at ¶¶ 16-17). In fact, the industry was highly skeptical that the features claimed in the 536 and 915 Patents could be developed, and greatly praised the introduction of Pierce's Ascendant Single Axle Quint – Pierce's product embodying these patents (Carter Decl. at ¶¶ 70-77; Kurfess Decl. at ¶¶ 51-54).

As a result of the patented innovations, Pierce's Ascendant Single Axle Quint has become the most popular apparatus in Pierce's history, generating significant sales and

profit for Pierce and its dealers (Carter Decl. at ¶¶ 78-80). Consumer demand for this line of fire apparatus is driven by Pierce's ability to offer the patented features, including a quint configuration apparatus, a single rear axle, and an aerial device with a vertical reach greater than 95 feet and a horizontal reach of greater than 90 feet, as shown through customer specifications and purchasing criteria, in addition to Pierce's marketing efforts to highlight those features and benefits (Barwick Decl. at ¶¶ 19-21; Carter Decl. at ¶¶ 85-91). Indeed, Pierce's customers choose the Ascendant Single Axle Quint precisely because of the patented features, and are even willing to pay a significant premium for those features (Carter Decl. at ¶ 86; Barwick Decl. at ¶ 18).

Two years after Piece introduced its groundbreaking Ascendant line, Defendants announced the introduction of the infringing product, the Metro 100 Quint (Barwick Decl. at ¶ 24). Based on Pierce's success with the Ascendant Single Axle Quint, Defendants highlight and tout the very features covered by the 536 and 915 Patents in promotion of their Metro 100 Quint, including its quint configuration, single rear axle, and an aerial device with a vertical reach greater than 95 feet and a horizontal reach of greater than 90 feet (*id*. at ¶¶ 24-25; Carter Decl. at ¶¶ 81-84).

As a result, Pierce's Ascendant Single Axle Quint and Defendants' Metro 100 Quint are in direct competition, and no other products currently on the market offer the combination of features claimed in the 536 and 915 Patents (Barwick Decl. at ¶ 25 (regarding direct competition); Carter Decl. at ¶¶ 92-100; Kurfess Decl. at ¶¶ 143, 190 (concluding that both the Ascendant Single Axle Quint and Metro 100 Quint practice the 536 and 915 Patents); Dufrane Decl. at ¶¶ 13-15). Notably, purchasers of the Ascendant Single Axle Quint or Metro 100 Quint would not find potential alternatives acceptable—

including units with double axles, a shorter ladder, a lower tip load, or any combinations thereof—which further evidences the nexus between these features and Defendants' infringement (Barwick Decl. at ¶ 27). These alternatives require increased upfront and long-term costs, decreased maneuverability, and lessened capabilities with regard to ladder reach and weight limits (*id*.). Accordingly, Defendants' ability to sell their Metro 100 Quint is the direct result of their infringement of the 536 and 915 Patents.

Accordingly, the patented features of the 536 and 915 Patents are significant drivers of demand for both the Ascendant Single Axle Quint and the Metro 100 Quint, and a strong causal nexus exists between the patented features and demand for the infringing product (Carter Decl. at ¶ 101).

### 2. Pierce's Single Axle Ascendant Quint Directly Competes with Defendants' Metro 100 Quint.

Direct competition between Pierce's Ascendant Single Axle Quint and Defendants' Metro 100 Quint, as described above, clearly suggests that Pierce has suffered, and will continue to suffer, irreparable harm. As recognized by the Federal Circuit, "[e]xclusivity is closely related to the fundamental nature of patents as property rights [and] is an intangible asset that is part of a company's reputation." *Douglas Dynamics, LLC v. Buyers Prods. Co*., 717 F.3d 1336, 1345 (Fed. Cir. 2013). Thus, "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Id*. "Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).

### 3. Defendants' Infringing Sales Harm Pierce's Dealers, Which In Turn Harms Pierce.

Defendants' acts also irreparably harm Pierce's dealer network, which is Pierce's direct sales force (Dufrane Decl. at ¶¶ 10, 15-26). This network consists of independently owned dealers that exclusively sell Pierce fire apparatus, some of which rely heavily on the sales of the Ascendant Single Axle Quint (*id.* at ¶¶ 10-12).

Because dealers play a significant role in marketing and selling Pierce products, Pierce prioritizes its relationships with those dealers (*id.*). But the sale of the Metro 100 Quint by Defendants harms this integral network (*id.* at ¶¶ 15-26). Several dealers have already expressed concerns about the Metro 100 Quint (*id.* at ¶ 18). And as a result of Defendants' infringing conduct, Pierce has already been forced to ███████████ ████████████████████████████████████████ to win sales against the Defendants' Metro 100 Quint, which disrupts Pierce's dealer network (*id.* at ¶¶ 15-17, 20-22, 26). Additionally, dealers now have to spend more time, effort, and money selling the Ascendant line, which pulls attention and resources away from all of Pierce's other product offerings and sales opportunities (*id.* at ¶¶ 23-25).

**4.** **Defendants' Infringing Sales Will Have Far-Reaching, Long-Term, Negative Impacts on Pierce's Revenues and Profits for the Ascendant Single Axle Quint Due to the Nature of the Fire Apparatus Industry.**

In the fire apparatus industry, customers have placed much weight on the knowledge and recommendations of other customers in the industry when making purchasing decisions (Carter Decl. at ¶¶ 43-44). In fact, when buying a new fire apparatus, one of the most important considerations by departments is word of mouth – i.e., the knowledge, experience, and recommendations of other departments (*id.* at ¶¶ 113-119; Barwick Decl. at ¶¶ 28-29). Where products that have not been established and proven, new customers are hesitant to purchase (Barwick Decl. at ¶¶ 28-29).

Because of these trends, Pierce relies heavily on the positive experiences of prior and reoccurring customers to market and sell its products to new customers that Pierce may otherwise never reach (Carter Decl. at ¶ 119; Barwick Decl. at ¶ 29). But Defendants' Metro 100 Quint threatens the sustainability of this marketing tool (Carter Decl. at ¶ 119; Barwick Decl. at ¶ 29). Not only does Pierce lose actual sales and market share, but Pierce also loses the opportunity to reach customers in the first place (Carter Decl. at ¶ 119; Barwick Decl. at ¶ 29). It is effectively deprived of the chance to educate existing and potential customers on the patented features and benefits of the Ascendant Single Axle Quint, and, as a result, may lose those customers who were never educated (Carter Decl. at ¶ 119; Barwick Decl. at ¶ 29).

**5.** **Defendants' Infringing Sales Will Also Negatively Affect Pierce's and Its Dealers' Ability to Sell Other Styles of Trucks, Parts, and Service.**

Lost sales of the Ascendant Single Axle Quint will also cause Pierce and its dealers to lose sales of additional products and services. As an initial matter, Pierce's dealers derive significant revenue not just from the sale of an apparatus, but also the additional products, such as firefighting equipment, and services that are sold along with the apparatus (Dufrane Decl. at ¶ 22). If Pierce and its Dealers are deprived of the opportunity to sell an Ascendant Single Axle Quint due to infringing competition from the Metro 100 Quint, then they have also lost the ability to sell additional parts and services to that customer (Barwick Decl. at ¶¶ 30, 32; Dufrane Decl. at ¶ 22).

In addition, customers within the fire apparatus have traditionally been brand loyal and strive to standardize their equipment across a single brand, and frequently purchase multiple apparatus from a single manufacture at once (Barwick Decl. at ¶ 31). Standardization generates several efficiencies, including simplified maintenance, technician training, and parts management, improved relationships with the manufacturer, and enhanced personnel effectiveness resulting from familiarity with the equipment (*id.*). Given customers' desire to standardize their equipment, the sale of a new apparatus, particularly to a new customer, often leads to the additional sale of other types of apparatus (Carter Decl. at ¶ 125, Barwick Decl. at ¶ 32).

Prior to Defendants' infringing activity, Pierce was able to penetrate customers that were loyal to other manufacturers by being the only manufacturer to offer its revolutionary Ascendant line of single axle quints (Dufrane Decl. at ¶ 9). Out of the ▇ Ascendant Single Axle Quint units sold to date (generating $▇ in revenue), ▇ of

these sales (generating nearly $██████ in revenue) were to new customers who had previously not purchased an apparatus from Pierce in the last 10 years (Carter Decl. at ¶ 124). Out of those ██ new customers, ██ customers purchased a total of 23 additional non-Ascendant apparatus, amounting to an additional $██████ in revenue for Pierce that it otherwise would not have enjoyed had it not been able to penetrate that customer with the Ascendant Single Axle Quint (*id.* at ¶ 125). With the Metro 100 Quint at play, however, Pierce will continue to lose not only the opportunity to sell the Ascendant Single Axle Quint, but also sales of other styles of trucks, parts, and service that flow as a natural result of the sale of an Ascendant Single Axle Quint.

### 6. Defendants' Infringement Has Eroded Pierce's Pricing

Defendants' infringing actions have caused, and will continue to cause, permanent pricing damage to Pierce. Prior to Defendants' entry into the market, Pierce was not only able to sell its Ascendant Single Axle Quint for more money than its other aerials, but it also maintained a ████████████████████████████████████████ ████████████████████████████ (Barwick Decl. at ¶ 18). Since the Metro 100 Quint was introduced, however, Pierce has had to ████████████████████ ████████████████ to compete with the Metro 100 Quint (Carter Decl. at ¶¶ 94-96; Dufrane Decl. at ¶¶ 15-18). Because pricing information is shared across customers in the industry, Pierce will be forced to abide by these pricing terms—even if Defendants are forced to exit the market—jeopardizing customer relationships and damaging Pierce's goodwill in the industry (Carter Decl. at ¶ 130).

**7.  Defendants' Continued Infringement of the
Metro 100 Quint Adversely Impacts Pierce's
Brand, Innovation, and Ability to Market Itself
as the Exclusive Provider of the Patented
Technology.**

As a final consideration, Oshkosh Corporation licensed the 536 and 915 Patents only to Pierce, which wants to preserve its right to prevent others from making, using, or selling its patented technology (*id*. at ¶ 134).  This is particularly true as Pierce contends it is a competitive advantage to be the exclusive provider (*id*.).

And to ensure its status as an innovative leader in this industry—a reputation Pierce has earned through significant, meaningful contributions—Pierce has made substantial investments into the research, development, manufacture, and sale of the Ascendant line.  Pierce's efforts related to the Ascendant Single Axle Quint were significant, and the revenues are necessary to fund future development of new and innovative products (*id*. at ¶ 133; Barwick at ¶ 34).  Defendants' infringement denies Pierce the value of its investment—a loss not compensable through patent damages.

**C.  The Balance of Hardships Favors Entry of a Preliminary
Injunction.**

Absent injunctive relief, Defendants would be able to capture market share from Pierce through the sale of infringing fire apparatus.  Rather than fair competition, Pierce would be subject to unfair competition against Defendants' infringing products.  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011) ("requiring [patentee] to compete against its own patented invention…places a substantial hardship on [the patentee]").  The unfair competition created by Defendants' wrongly-obtained market gains places a significant hardship on Pierce.  This hardship surely outweighs any

alleged hardship on Defendants, which is minor.  Defendants, for example, may continue making, using, selling, and offering for sale non-infringing products.

        **D.**        **The Public Interest Favors Entry of a Preliminary Injunction.**

The public interest favors the enforcement of Pierce's patent rights.  *See Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) ("We have long acknowledged the importance of the patent system in encouraging innovation.").  The exclusionary rights conveyed in patents incentivize and reward research and development.  *Celsis*, 644 F.3d at 931-32.  As the Federal Circuit has observed, that incentive "would be adversely affected by taking market benefits away from the patentee and giving them to the accused infringer..."  *Id.* (citing *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362-63 (Fed. Cir. 2008)).

Further, the parties to this litigation are in direct competition with one another.  *See Celsis*, 644 F.3d at 932.  As a result, if the Court enters a preliminary injunction, the public can obtain the patented fire apparatus from Pierce.  Alternatively, the public could purchase non-infringing fire apparatus from Defendants.  There can be no countervailing public interest in permitting Defendants to continue selling infringing products.

## CONCLUSION

Pierce respectfully requests that this Court grant its motion and enter a preliminary injunction precluding Defendants from making, using, selling, and offering to sell fire apparatus that infringe Pierce's 536 and 915 Patents.

Respectfully submitted this 23rd day of February, 2018.

_/s/ Sherry D. Coley_
Sherry D. Coley
State Bar No.: 1038243
T. Wickham Schmidt
State Bar No.: 1062002
DAVIS & KUELTHAU, s.c.
318 S. Washington Street, Suite 300
Green Bay, WI 54301
Phone: 920-435-9378
Fax:    920-435-9391
scoley@dkattorneys.com
wschmidt@dkattorneys.com

Todd B. Benoff (admission pending)
Todd.Benoff@alston.com
ALSTON & BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, CA 90071-3004
Phone: 213-576-1000
Fax:    213-576-1100

Scott J. Pivnick
Scott.Pivnick@alston.com
ALSTON & BIRD LLP
The Atlantic Building
950 F Street NW
Washington, DC 20004-1404
Phone: 202-239-3300
Fax:    202-239-3333

Joshua M. Weeks (admission pending)
Joshua.Weeks@alston.com
Lindsay C. Church (admission pending)
Lindsay.Church@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street, Suite 4200
Atlanta, Georgia 30309-3424
Phone: 404-881-7000
Fax:    404-881-7777

*Attorneys for Plaintiff Pierce Manufacturing Inc.*